**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

BRENT ALAN LOYD,          )
                                 )
         Plaintiff,       )
v.                         )
                                 )
UNITED STATES OF AMERICA,  )        Case No. 4:25-cv-00963-MTS
                                 )
                                 )
        Defendant.     )
                                 )
                                 )

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

**I. PRELIMINARY STATEMENT**

**1.** Plaintiff, Brent Alan Loyd, a Navy SEAL Chief Petty Officer medically retired without pay and diversely qualified Dual-Sector Subject Matter Expert, primarily Advanced Tactical Practitioner (ATP), National Registry Emergency Medical Technician – Paramedic (NREMT-P), and Joint Terminal Attack Controller, brings this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680 **(Exhibit 1a)**.

**2.** At all times relevant to this complaint, the Plaintiff maintained specialized clinical training in medical, trauma, and psychiatric evaluation. The expiration of the Plaintiff's ATP certification and USCG 100GT Captain's License are the proximate result of the Defendants' Coordinated Administrative Failure and the Constructive Denial of the Master Record required for professional recertification.

**3.** Because the Plaintiff was a qualified medical professional (ATP, NREMT-P), his specific requests for a clinical bridge and PTSD/TBI evaluation constituted a **professional-grade notice** of a **medical crisis**. The Defendants' disregard of these alerts in favor of a non-clinical

administrative construct—specifically the manufactured "Bipolar I" narrative that was not disclosed to the Plaintiff during the intake call for required consent—represents a terminal Ministerial Breach of clinical standards of care and record integration mandates **(Exhibit 2b, 3c, 3f, 3g, 3h, 5a)**.

**4.** This action addresses a coordinated campaign of Clinical Spoliation, Unauthorized Procedural Bypasses, and Administrative Attrition intended to suppress exculpatory clinical evidence and obstruct the Plaintiff's access to healthcare benefits and his primary adjudicative records.

**5.** As established by federal records, the Plaintiff was a civilian-equivalent Reservist in a protected DWELL status during the foundational injury of September 10, 2020 **(Exhibit 2c; Exhibit 2i)**. The subsequent injuries documented herein constitute a Post-Discharge Continuity of Injury.

**6. The Evidentiary Baseline:** Due to the Defendants' ongoing Breach of Mandatory Directive regarding record maintenance (DoDI 6040.45), the Plaintiff has been subjected to a total Master Record Blockade. In response, the Plaintiff—utilizing his professional standing as a Dual-Sector SME—has executed a Forensic Reconstruction of the administrative and clinical timeline. The allegations and exhibits presented herein are synthesized from facially reliable secondary archives and contemporaneous professional alerts. This reconstruction is the only available remedy to correct the Clinical Spoliation executed by the Defendants and is presented to ensure the Court has a facially reliable account of the ministerial breaches at issue.

## II. JURISDICTION AND VENUE

**7.** This is a civil action brought against the United States of America under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, for personal injuries and economic losses

proximately caused by the Ministerial Breaches, negligent acts, and wrongful omissions of employees of the Department of Veterans Affairs and the Department of the Navy while acting within the scope of their office or employment.

**8.** Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1346(b)(1) because the United States, if a private person, would be liable to the Plaintiff in accordance with the law of the State of Missouri. Furthermore, the Discretionary Function Exception, 28 U.S.C. § 2680(a), does not apply to the acts and omissions alleged herein. The sovereign immunity of the United States is explicitly waived because the federal employees in question violated specific, mandatory federal mandates—including but not limited to VHA Directives, DoD Instructions, and SECNAVINST "shall" commands—which left no room for policy judgment or choice.

**9. Inapplicability of the Feres Doctrine (Non-Incident to Service):** Plaintiff's claims are not barred by the *Feres* doctrine. At the time of the initial September 10, 2020, ministerial breach, Plaintiff was in a protected Reserve DWELL status following a SEAL Task Element deployment, holding a civilian-equivalent status regarding the administrative and clinical care duties owed by the Defendants. Because these injuries arose while Plaintiff was in a status equivalent to a civilian, they fall squarely within the Non-Incident to Service Exception. The subsequent and continuous breaches constitute an uninterrupted continuum of liability from that initial civilian-equivalent tort to the ongoing post-service injuries.

**10. Employment Status:** At all times relevant to this Complaint, the individuals executing the ministerial breaches alleged herein were acting as direct, W-2 employees of the Department of Veterans Affairs and/or the Department of the Navy, acting within the scope of their employment. To the extent any involved personnel were technically classified as contractors, the United States retained and exercised pervasive, day-to-day physical and operational control over

their specific duties, rendering them *de facto* federal employees under 28 U.S.C. § 2671 for the purposes of FTCA liability.

**11. Limitations of Pro Se Pleading:** The Plaintiff, appearing pro se, anchors this First Amended Complaint exclusively within the waiver of sovereign immunity provided by the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b). This action is predicated solely on the Defendants' breaches of non-discretionary ministerial duties, operational negligence, and the Clinical Spoliation of records. To the extent any factual allegations herein might be broadly construed by Defendants as challenging a discretionary policy or asserting an intentional tort—such as misrepresentation, deceit, or interference with contract rights regarding financial ledger data— the Plaintiff clarifies that such interpretations are unintended artifacts of his status as a self-represented litigant. Plaintiff's claims sound strictly in administrative and clinical negligence. Pursuant to the judicial standard for pro se pleadings established in *Haines v. Kerner*, 404 U.S. 519 (1972), any such phrasing is non-central to the claims and is to be liberally construed in favor of the Plaintiff's clearly stated intent to seek relief for Ministerial Negligence and breaches of mandatory "shall" commands.

**12. Evidentiary Context (FOIA/NCIS):** While the factual matrix of this Complaint necessarily details the Plaintiff's submission of Freedom of Information Act (FOIA) requests and disclosures to the Naval Criminal Investigative Service (NCIS), Plaintiff explicitly disclaims any independent federal statutory causes of action arising under FOIA (5 U.S.C. § 552) or federal whistleblower protection frameworks. These references are pleaded exclusively as evidentiary context to establish the timeline, demonstrate Defendants' actual notice, and illustrate the proximate cause of the ministerial torts. The actions involving the NCIS tip and FOIA handling are not presented to challenge the agency's discretionary judgment, but to evidence the cascading

failure to execute fundamental ministerial duties from the initial tort to the present day. The 44-month blockade of the requested information necessitated the multi-year forensic reconstruction of evidence provided herein.

**13. Timeliness, Accrual, and the Discovery Rule:** Plaintiff's claims are timely filed. Under the Discovery Rule, the full scope and mechanism of the Plaintiff's injuries—specifically the catastrophic post-service financial damages and employment interference—were not reasonably discoverable until after the Plaintiff's medical retirement and transition to civilian status on March 30, 2024. Prior to and extending beyond this date, the Defendants' active concealment and an ongoing 44-month Master Record blockade prevented the Plaintiff from discovering the essential operative facts giving rise to these claims. Furthermore, under the Continuing Tort Doctrine, the Defendants' continuous, compounded ministerial breaches—which actively followed the Plaintiff into his civilian status—constitute an uninterrupted, ongoing wrong. Consequently, the statute of limitations is tolled, and the claim does not fully accrue until the cessation of the Defendants' final wrongful act.

**14. Expert Medical Affidavit:** To the extent that Plaintiff's claims of negligent misdiagnosis are construed as medical malpractice under Missouri state law, Plaintiff has fully satisfied the procedural and jurisdictional requirements of Mo. Rev. Stat. § 538.225. Attached hereto as **Exhibit 3c** is the sworn and notarized Affidavit of Merit by Dr. Nikole Roberts, PhD, confirming that the Defendants failed to use the required degree of skill and learning, and that such clinical negligence directly contributed to the Plaintiff's injuries.

**15. Venue:** Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1402(b). While the Plaintiff resides in the Southern District of Illinois, the ministerial acts and omissions giving

rise to the claims occurred at the John Cochran Veterans Hospital and associated administrative facilities within this judicial district.

### III. ADMINISTRATIVE EXHAUSTION AND THEORY OF LIABILITY

**16. Exhaustion of Remedies:** Plaintiff has exhausted all mandatory administrative remedies as required by 28 U.S.C. § 2675(a). On or about July 29, 2022, Plaintiff timely filed an administrative claim (Standard Form 95) with the Department of Veterans Affairs **(Exhibit 1x)**. This claim was formally denied in writing on December 27, 2024 **(Exhibit 1y)**.

**17. Procedural History:** This First Amended and Supplemental Complaint is filed on April 9, 2026 pursuant to the Court's Order of March 18, 2026 (Doc. 28), which vacated the prior dismissal and explicitly identified this matter as "open and active."

**18. Theory of the Cascading Ministerial Breach:** Plaintiff's theory of liability is predicated on a "Cascading Breach." The September 10, 2020, misdiagnosis was the inciting incident that set off a predictable and foreseeable cascade of subsequent administrative and clinical failures. The later acts—including VA metric gaming, shadow-board communications, and unverified debt certification—are not independent torts, but the proximate "fallout" and somatic damages resulting from the original wrongful acts.

**19. Exception to Administrative Claim Limitation (28 U.S.C. § 2675(b)):** Pursuant to 28 U.S.C. § 2675(b), the Plaintiff seeks a sum certain in excess of the amount stated in the initial administrative claim (SF-95). This escalation is strictly necessitated by newly discovered evidence and intervening facts. These include the 2024–present Non-Compensated Medical Retirement calculation, the post-discharge referral of unverified debt to the U.S. Treasury, and the erroneous erasure of the Plaintiff's Civilian Security Clearance. These distinct economic

injuries were not reasonably discoverable at the time of the initial filing due to the Defendant's ongoing Constructive Denial of the Master Record. The multi-year forensic reconstruction required to overcome this administrative blockade revealed the full scope of the Defendant's ministerial negligence and the resulting somatic and economic damages only after the initial administrative claim was filed.

**20. Specific Economic Damage: The Destruction of Three Shades Maritime LLC:** Prior to the foundational tort of September 2020, the Plaintiff maintained a Vested Economic Expectancy through Three Shades Maritime LLC, the operational vehicle for high-value maritime operations, specialized security contracting (SOSC), and media production. As a Navy SEAL Chief with 15 years of elite service at the time of the initial breach, possessing an exceptional "hard skill" set, the Plaintiff was a prime candidate for elite security contracts, with established commercial rates of $3,000.00 per day **(Exhibit 2d)**.

**21. The Institutional Blockade and The "Permissive Lever" Bypass:** The Defendants' primary ministerial breaches—the unconsented misdiagnosis of Bipolar I Disorder and the subversive implementation of a Category I Patient Record Flag (PRF) via the Disruptive Behavior Committee (DBC)—functioned as "Toxic Administrative Flags." These were not discretionary safety actions. Instead, the Defendant utilized the PRF as a "permissive lever" to artificially bypass mandatory Privacy Act constraints. This mechanism allowed the VA to execute an unauthorized, wholesale transfer of the Plaintiff's spoiled medical file (specifically spanning August 2020 through April 2021) directly to the Navy's administrative "Shadow Board" to orchestrate the denial of military benefits.

**22. Violation of Limited ROI and Introduction of Subsequent Spoliation:** This transfer was executed through a brazen, extra-procedural bypass of HIPAA protections and VHA Directive

1605.01. The Plaintiff had executed a highly specific Release of Information (ROI) that strictly limited disclosure *only* to records generated by Dr. Gesmundo. The Defendants willfully ignored this limitation. Utilizing the PRF as administrative cover, the Defendants unlawfully transmitted the highly corrupted, broader medical record to the Navy. Furthermore, during this unauthorized transmission, the Defendants engaged in continued clinical spoliation by introducing yet another undisclosed, unconsented diagnosis—"Adjustment Disorder"—as the primary rationale to ensure the ongoing denial of the Plaintiff's LOD-HC appeal. The use of a safety tool to bypass a limited ROI for non-safety, administrative objectives constitutes a terminal ministerial breach that proximately caused the injuries alleged herein. This unlawfully transmitted, corrupted record became the poisoned foundation for subsequent adverse adjudications, specifically the administrative appeals overseen by Navy officials (including the Casella, Hamstra, and Balduf boards). By relying on this spoliated evidence, these boards perpetuated the diagnostic bias and utilized secondary unverified diagnoses (such as 'Adjustment Disorder') to justify the ongoing denial of benefits and procedural due process **(Exhibit 9b)**.

**23. Terminal Attrition of Three Shades Maritime LLC:** This coordinated blockade proximately caused the Terminal Attrition of the Plaintiff's business viability and vested economic expectancies. Specifically, during the high-stakes selection process for a Specialty Overseas Security Contracting (SOSC) position, the Plaintiff's operational "hard skills" were deemed exceptional and a "good fit," despite the Plaintiff screening with an active hernia proximately caused by the Defendant's induced somatic harm loop. However, the subsequent untreated vestibular dysfunction (BPPV) and acute PTSD symptoms—denied treatment due to the VA's ongoing administrative interference—prevented the Plaintiff from achieving the cognitive and physical presence required for the final stage of industry-unique tradecraft training.

Because the VA's 'Toxic Record'—and its subsequent validation by the Casella//Hamstra/Balduf shadow boards—barred the Plaintiff from clinical recovery during his narrow eligibility window, the Defendants' negligence resulted in the total and permanent insolvency of Three Shades Maritime LLC's contract trajectory with multiple revenue streams (Disney+, specialty training charters, Global Film Security among others) **(Exhibit 2d)**.

### IV. COMPENDIUM OF NON-DISCRETIONARY MINISTERIAL MANDATES

**24. The Ministerial Duty Framework:** Pursuant to the Ministerial Duty framework, Plaintiff identifies the following non-discretionary federal mandates ("shall" and "must" commands) breached by the Defendant. The specific text and abstracts of these mandates are incorporated herein and provided in the referenced Exhibits.

**25. Clinical Documentation and Record Integrity:** The Defendants possessed mandatory requirements to ensure health record integrity. Specifically, VHA Directive 1907.01 mandates that VHA facilities *"shall implement a Clinical Documentation Integrity (CDI) program"* designed to *"accurately represent the severity and acuity of the patient."* Furthermore, 38 C.F.R. § 1.579 imposes strict statutory mandates requiring the Defendants to maintain records with the accuracy and completeness necessary to assure fairness to the individual **(Exhibit 1b)**.

**26. Mental Health Clinical Integrity and Diagnostic Veracity:** The Defendants were bound by VHA Directives 1004.01 and 1160.01, which mandate that VA facilities *"must provide evidence-based mental health services."* Concurrently, under 9 CSR 30-3.151, the Defendants maintained a non-discretionary requirement that *"A diagnosis shall be rendered in accordance with the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)"* **(Exhibit 1c)**.

**27. Adjudicative Due Process and Personnel Records:** Pursuant to MILPERSMAN 1070-080, *"Commanding Officers shall ensure that all personnel records are accurate and timely... The member's record shall accurately reflect combat service and qualifications."* Furthermore, DoDI 1332.18 and SECNAVINST 1850.4E established mandatory procedural gates for disability evaluation, mandating that the Command *"shall assign a Physical Evaluation Board Liaison Officer (PEBLO)"* and that *"the member shall be given an election of options"* prior to adverse adjudication **(Exhibit 1d)**.

**28. Debt Verification and Fiscal Mandates:** Under 31 C.F.R. § 285.3, the Defendants possessed non-discretionary mandates stating the agency *"shall provide a certification to the Treasury that the debt is past-due and legally enforceable."* This includes the strict duty of the Debt Collection Office under DoD 7000.14-R, Vol. 16, which dictates that the office *"will verify the debt to ensure it is valid and in the correct amount"* before referral **(Exhibit 1e)**.

**29. Investigative Notice and Evidence Preservation:** Upon receiving notice of potential claims, the Defendants were required by JAGINST 5800.7G to act, as *"A litigation-report investigation shall be convened when an incident or event occurs which is likely to result in claims or civil litigation."* Additionally, NCIS Manual 1-1 mandates that NCIS *"shall provide to each command... information concerning administrative or disciplinary action,"* prohibiting the arbitrary blockade of the Plaintiff's Master Record **(Exhibit 1f)**.

**30. Patient Conduct, Privacy, and Record Flagging:** The Defendants were bound by 38 C.F.R. § 1.512, which mandates that clinical files *"shall be confidential and privileged, and no disclosure thereof shall be made."* VHA Directive 1605.01 further commands that *"VHA must protect the privacy and confidentiality of a patient's health information."* Additionally, under 38 C.F.R. § 17.107, any restriction on care (such as a Patient Record Flag) *"must be narrowly*

*tailored to the individual's behavior"* and strictly prohibits the use of flags for administrative or retaliatory objectives **(Exhibit 1g)**.

**31. Reserve Personnel and DWELL Status Protections:** Pursuant to SECNAVINST 1770.5, the Defendants owed mandatory clinical protections to Reservists, dictating that members who aggravate an injury in the Line of Duty *"shall be managed... with the goal of returning the member to a fit-for-duty status."* Furthermore, VHA Directive 1010 dictates that *"VHA must ensure that all Post-9/11 Service members... are provided a supported transition"* **(Exhibit 1h)**.

**32. Security Clearance Data Retention:** Pursuant to DoDM 5200.02 and SEAD Guidelines, upon a member's separation, the agency *"shall preserve the member's security clearance eligibility"* in an active or valid-archived status for a standard period of 24 months, a non-discretionary mechanism designed to protect civilian employability **(Exhibit 1i)**.

**V. FACTUAL ALLEGATIONS**

**A. The Elite Baseline and Vested Economic Expectancy (Pre-September 2020)**

**33. Established Educational Trajectory and Vested Expectancy:** Prior to the foundational tort of September 10, 2020, the Plaintiff maintained commercial solvency, elite dual-sector clinical credentialing, and a Vested Economic Expectancy. This was characterized by a high-velocity career trajectory and academic excellence, as evidenced by his pursuit of a Bachelor of Science in Sports and Health Sciences (ultimately awarded Magna Cum Laude). Based on his established academic progression, the Plaintiff was on a mathematical track to complete this degree by the end of 2020 having completed 18 credit hours during the period of his recent performance evaluation **(Exhibit 1a p. 13-14)**.

**34. The Induced Somatic Crisis and Educational Blockade:** Following his demobilization from high-tempo operations, the Plaintiff experienced a foreseeable, acute manifestation of service-connected PTSD as warned by Dr. Buterbaugh in her notes releasing him back to duty without limitations in January 2020 **(Exhibit 2b p. 5)**. As objectively corroborated by the Marcus Institute for Brain Health (MIBH), the Plaintiff suffered from severe sleep deprivation resulting in executive dysfunction and uncontrollable neurocognitive rumination, compounded by pandemic-era environmental triggers **(Exhibit 3h)**. Rather than providing the mandated clinical stabilization, the Defendant's medical abandonment and clinical spoliation forced the Plaintiff into an unmanageable "survival mode." The Plaintiff was compelled to divert all cognitive, physical, and financial resources away from academic advancement simply to secure life-saving healthcare and combat the fabricated diagnostic narrative. This induced somatic crisis proximately caused a 24-month delay in both his access to health care, his graduation and the terminal disruption of his civilian career progression **(Exhibit 3a)**.

**35. Dual-Sector Clinical Subject Matter Expertise:** The Plaintiff possessed an elite clinical baseline, functioning as an Advanced Tactical Practitioner (ATP) and National Registry Paramedic (NREMT-P). The Plaintiff's official duties as a Platoon Medical Department Head included non-discretionary ministerial responsibilities for 100% accountability of controlled medications, sick-call care, referrals for elite operators, and Medical Mission Planning. In this capacity, the Plaintiff served as the primary clinical liaison between NSW leadership and the Command Medical Department **(Exhibit 1a)**. Crucially, while these credentials were forged in military service, the Plaintiff's status at the time of the foundational injury was strictly that of a civilian-equivalent Reservist in a protected DWELL status **(Exhibit 2c)**, placing the Defendant's

subsequent breaches squarely within the FTCA's waiver of sovereign immunity under the *Brooks* and *Broudy* doctrines.

**36. The Longitudinal Habit of Service:** Between 2015 and 2018, while operating as a civilian 3rd Phase BUD/S Instructor, the Plaintiff established a documented, longitudinal habit of providing uncompensated Subject Matter Expertise (SME) to his Reserve Command, SEAL Team SEVENTEEN (ST-17). The Defendant frequently utilized the Plaintiff's elite baseline without pay or drill-point status, establishing a "Course of Dealing" predicated on the Plaintiff's high-velocity utility and reliability to the Naval Special Warfare (NSW) community **(Exhibit 2e)**.

**36. Unblemished Leadership Mobilizations:** From 2018 to March 2020, the Plaintiff volunteered for and served with distinction as the Leading Petty Officer for, two high-visibility mobilizations to the Korea Area of Operations during a peak period of politically sensitive actions. The extraordinary nature of his service immediately prior to the tortious acts is explicitly detailed in two Navy Commendation Medals and his official Performance Evaluation, signed and delivered to the Plaintiff in July 2020. This evaluation certified the Plaintiff's elite status merely one month before the Defendant's agents initiated an unauthorized extra-clinical intervention and executed a factually unsupported administrative deviation from this verified baseline **(Exhibit 1a p. 17-18; Exhibit 2f; Exhibit 3b)**.

**B. The Administrative Quid Pro Quo: Dwell Waiver and Medical Mitigation**

**38. The Operational and Economic Baseline:** Prior to the April 26, 2019, deployment waiver, the Plaintiff was a high-performing Task Element Alpha Leading Petty Officer operating in a documented state of physiological fragility following a deployment to the Korea theater. The

Plaintiff possessed a strict regulatory right to "Dwell Time" (mandatory recovery) and was simultaneously executing a highly lucrative civilian consulting and maritime career via his commercial enterprise, Three Shades Maritime LLC. As established by executed contracts and invoices, the Plaintiff's specialized USCG credentials and operational baseline commanded rates of $3,000.00 per day executing elite private-sector maritime charters and serving as a sub-contractor for specialized government contracting agencies **(Exhibit 2d, pp. 1-2)**. Despite his need for recovery and his active commercial pipeline, the Plaintiff was specifically requested by the Command to waive his Dwell Time to provide a critical leadership continuity bridge for SEAL Team 18 reserve members deploying to Korea as Task Element Charlie **(Exhibit 2a; Exhibit 2e)**.

**39. The Non-Discretionary Special Duty of Care:** Upon the Plaintiff's waiver of safety protections under OPNAVINST 3000.13 (Personnel Tempo Policy), the Defendant assumed a non-discretionary, ministerial Special Duty of Care to implement the clinical mitigation plan documented in the Haynie SF600 medical record **(Exhibit 2b, pp. 11)**. This duty mandated that the Defendant medically manage the Plaintiff's "fragile health state" to prevent the "Total Attrition" warned of in DoDI 6040.45 and DoDI 6490.08 **(Exhibit 1b; Exhibit 1h)**.

**40. The Breach of Continuity and Unauthorized Referral Loop:** While extracting the strategic value of the Plaintiff's Dwell waiver, the Defendant following HMC Haynie's PCS (specifically new to the department head LCDR Leber and ST-17 Medical) refused to integrate the objective physical diagnostic findings (Moderate Sleep Apnea/TBI) required to stabilize the Plaintiff's baseline **(Exhibit 2b, pp. 13-14)**. Instead of utilizing the TRICARE-approved biometric data secured in the Korea theater, the Defendant initiated an unauthorized administrative "referral loop." The Defendant directed the Plaintiff to seek a "fresh referral" and

warned he would potentially have to be "seen out in town" for a redundant study **(Exhibit 2g)**. This refusal to facilitate clinical follow-up mandated by DoDI 6490.03, and the failure to maintain an accurate record under MILPERSMAN 1070-080, constituted a terminal breach of the Command's ministerial duty to manage medical readiness **(Exhibit 1b)**.

**41. Causation: Acute Neurocognitive Exhaustion:** The Defendant's extraction of strategic value, followed by the ministerial failure to implement the mandatory safety governors outlined in the HMC Haynie SF600, served as the direct and proximate cause of the Plaintiff's Acute Neurocognitive Exhaustion. But-for the Defendant's initiation of the unauthorized "referral loop" **(Exhibit 2g)** and the simultaneous refusal to stabilize the Plaintiff's verified Sleep Apnea/Anxiety/TBI baseline, the Plaintiff would have retained the cognitive and physical capacity to finalize his professional credentials, maintain reserve readiness, and manage his commercial estate. The ensuing "Total Attrition" was not an inevitability of service; it was the direct clinical result of the Defendant forcing a 15-year combat veteran to operate at an elite tempo without the contractually and regulatorily mandated medical support.

**42. Causation: Geographic Displacement and Medical Relocation:** The Defendant's failure to provide initial continuity of care forced a catastrophic geographical displacement. Following the foundational medical crisis, the Plaintiff was formally directed by NSWG-11 Neuropsychologist Sarah Henry to relocate away from his commercial operating base in San Diego, California (and away from SEAL Team SEVENTEEN), to establish a support network and receive necessary care.

**43. Causation: The Care Blockade and Medical Void:** However, upon this mandated relocation, the Defendant executed a subsequent Institutional Care Blockade. This blockade was triggered by an unauthorized, extra-clinical phone call between ST-17 staff and the St. Louis VA

Transition Case Management staff, which stranded the Plaintiff in a medical void. This unauthorized entanglement of LOD-HC and MRR processes barred the Plaintiff from competent neurological treatment for over two years until he finally secured access to a Polytrauma clinic via independent charity referrals.

**44. Damages: Commercial Forfeiture and Terminal Insolvency:** This forced geographical separation, combined with his administratively induced physical deterioration, rendered the Plaintiff physically and logistically incapable of executing mandatory vessel surveys or maintaining his commercial maritime assets. As a direct and proximate result, the Plaintiff suffered the terminal insolvency of Three Shades Maritime LLC, the forfeiture of his $3,000/day specialized government / other charter contracts, and the loss of his commercial vessel. This economic destruction is evidenced by the November 15, 2021, Wharfage Termination and the accumulation of over $27,744.00 in resultant commercial debt **(Exhibit 2h, pp. 1-2)**.

**45. Damages: Somatic Degradation and Surgical Intervention:** Furthermore, the two-year blockade of competent trauma care proximately caused profound physiological degradation. The Defendant's medical abandonment necessitated two (2) subsequent surgical interventions—with a probable third pending—to repair the somatic and structural damage inflicted by the prolonged, untreated state of neurocognitive and physiological distress **(Exhibit 3h)**.

**C. The Extra-Clinical Interference and Referral Void (July–August 2020)**

**46. The Clinical Baseline and Acute Intervention:** In July 2020, the cumulative physiological and psychological toll of repetitive combat deployments, exacerbated by the Defendant's ongoing records blockade, resulted in a medically foreseen, acute crisis. To stabilize the Plaintiff,

NSWG-11 Neuropsychologist Sarah Henry formally directed him to establish a support network at his home of record and initiated a specialized referral to the St. Louis VA Polytrauma Clinic.

**47. The Emergency Room Verification (August 6, 2020):** On August 6, 2020, the Plaintiff self-reported to the St. Louis VA Emergency Room. During this encounter, the attending VA ER physician contacted Dr. Sarah Henry directly by telephone to confirm the referral conditions and clinical rationale. Following this inter-agency medical verification, the VA ER note explicitly documented the Plaintiff's presentation as "clinically apparent TBI, PTSD" and formally recorded these exact conditions under the official clinical impression **(Exhibit 2b, pp. 8-9)**.

**48. The Verified TCM Intake (August 12, 2020):** At this juncture, the Plaintiff's clinical baseline was firmly anchored in his 15-year combat history and his verified referral for TBI and PTSD. This service-connected reality was explicitly confirmed by VA Transition Case Manager (TCM) Heather Brown during her initial intake encounter with the Plaintiff on August 12, 2020. During this assessment, TCM Brown documented the Plaintiff's articulate presentation, verified his eligibility, and confirmed the established medical trajectory toward the Polytrauma Clinic **(Exhibit 2b, pp. 11-15)**.

**49. Duty: Clinical Independence and Confidentiality:** Pursuant to the Ministerial Mandates identified in Section IV, the Defendant possessed a non-discretionary duty to maintain the clinical independence of the TCM team from external administrative or command-level influence. This is strictly mandated by VHA Directive 1110 and is further anchored in Missouri state law, which recognizes a strict Fiduciary Duty of Confidentiality and Independent Clinical Judgment between medical providers and patients (*Brandt v. Medical Defense Associates*, 856 S.W.2d 667) **(Exhibit 1c)**.

**50. Duty: Continuity of Care and Deconfliction:** Furthermore, under SECNAVINST 1770.3D, the Defendant maintained a non-discretionary duty to provide immediate clinical deconfliction for Reservists in crisis without imposing secondary administrative prerequisites. This military mandate parallels the Missouri Standard of Care regarding Continuity of Care, which strictly prohibits the medical abandonment of a patient during a period of acute vulnerability (*Longo v. Connor*, 201 S.W.3d 503) **(Exhibit 1h)**.

**51. Breach: Unauthorized Extra-Clinical Influence:** The Defendant committed Ministerial Negligence through an unauthorized, extra-clinical intervention. On August 18, 2020, LCDR Amy Leber (ST-17 Medical) initiated documented contact with VA TCM Heather Brown outside of proper clinical channels **(Exhibit 4a)**. This was not a clinical coordination effort, but a breach of mandatory directives designed to administratively offload the Plaintiff to preserve command readiness metrics. Immediately following this contact, LCDR Leber issued an email demanding the Plaintiff complete a 6-month Post-Deployment Health Re-Assessment (PDHRA) as an unauthorized administrative prerequisite, effectively prioritizing command "metric gaming" over the Plaintiff's clinical stabilization **(Exhibit 4c)**.

**52. Causation: The "180-Degree Pivot":** The Defendant's extra-clinical contact was the direct and proximate cause of an unauthorized "180-degree pivot" in the Plaintiff's care plan. Having previously verified the Plaintiff's articulate military and medical baseline on August 12, TCM Heather Brown explicitly altered the clinical narrative following her August 18 call with LCDR Leber, noting: *"...the veteran has been asked about his military history and his status but the information is hard to understand due to his mental health history."* This inter-agency collusion was solidified by TCM Brown's own notation: *"LCDR Leber stated she understood"* **(Exhibit 4a; Exhibit 4b)**.

**53. Causation: Administrative Narrative Filtering:** This exchange proximately caused the VA TCM to adopt the Defendant's administrative narrative and willfully ignore the verified Polytrauma referral. By adopting this administrative convenience to purge a complex patient from their respective systems, the Defendants initiated a systematic pattern of Administrative Narrative Filtering. Objective, doctor-verified evidence of combat trauma was filtered out of subsequent chart entries in favor of a manufactured narrative of patient "non-compliance" **(Exhibit 7; Exhibit 7a; Exhibit 7b)**.

**54. Damages: Institutional Care Blockade and Latent Insolvency:** This breach resulted in an immediate Institutional Care Blockade, severing the Plaintiff from a clear medical path to recovery. The resulting clinical friction and diagnostic "poisoning" proximately led to the Plaintiff's failure to secure specialized Brain Injury treatment and locked him into an ongoing "Survival Mode." This unmitigated state of crisis proximately caused the latent insolvency of Three Shades Maritime LLC **(Exhibit 3a, 2h)**.

**55. Damages: Somatic Harm Loop and Deterioration:** The severe stress of this administrative abandonment proximately caused the acute aggravation of the Plaintiff's TBI/PTSD symptoms, subjecting him to documented "chronic neurocognitive overload" **(Exhibit 3a, p. 1)**. The unauthorized inter-agency coordination executed by the Defendant caused a total delay of competent healthcare for over two years. This deterioration is explicitly confirmed by independent clinical experts, notably Dr. Perris Monrow, who certified that the Plaintiff's *"medical condition significantly deteriorated during his time seeking care"* **(Exhibit 3a, p. 2; Exhibit 3c; Exhibit 3g)**.

**D. The Diagnostic Pivot, Administrative Blockade Escalation, & Physical Injury: Zone Bravo (Kinetic Phase)**

**56. The Established Clinical Baseline:** Prior to September 10, 2020, the Plaintiff possessed a documented, longitudinal clinical baseline of combat-related PTSD and Traumatic Brain Injury (TBI). This baseline was verified by multiple VA providers (including Emergency Department and TCM personnel) and Department of Defense providers, specifically Dr. Paul Sargent (2013-2014) **(Exhibit 2b, pp. 16-17)** and Dr. Karen Buterbaugh (January 2020). Dr. Buterbaugh explicitly issued a "Released w/o Limitations" determination with specific instructions to monitor for delayed-onset PTSD symptoms **(Exhibit 2b, p. 5)**. This baseline was further corroborated on the very morning of the foundational tort (September 10, 2020) by VA Primary Care Provider Dr. Thomas Heitker, who conducted an objective evaluation and documented the intent to establish care for primary concerns regarding the Plaintiff's "mental health," specifically PTSD and hypervigilance **(Exhibit 3d, pp. 1-8)**.

**57. Duty: Diagnostic Integration and Informed Consent:** Pursuant to VHA Directive 1004.01 (Informed Consent) and VHA Directive 1160.01, the Defendant's medical personnel possessed a non-discretionary, ministerial duty to reconcile any new diagnostic entries with the established clinical record. Furthermore, the Defendant was legally mandated to utilize standardized diagnostic tools (DSM-5) for Axis I determinations, as required by 9 CSR 30-3.151, and to provide mandatory patient education and obtain informed consent to ensure "fairness" under VHA Directive 1004.04 **(Exhibit 1c)**.

**58. Breach: Clinical Spoliation and the Audio-Only Intake:** On the afternoon of September 10, 2020, the Defendant's agent (NP Kimberlee Hansen) committed a terminal ministerial breach of these duties by executing the Clinical Spoliation of the Plaintiff's record during a 47-minute audio-only intake. NP Hansen intentionally suppressed the Plaintiff's verified combat trauma baseline and the same-day findings from Dr. Heitker. Instead, NP Hansen entered a medically

unsupportable "Bipolar I" diagnosis without meeting the mandatory DSM-5 seven-day manic criteria, and entirely failed to obtain the required informed consent for this radical diagnostic pivot **(Exhibit 1c; Exhibit 3c; Exhibit 3f; Exhibit 5a)**.

**59. The Adjudicative Link and Procedural Impossibility:** The coordinated nature of this ministerial breach is factually confirmed by the October 5, 2020, PERS-95 denial of benefits **(Exhibit 5b)**. This document explicitly links the unverified September 10, 2020, diagnosis to an earlier August 11, 2020, request from SEAL Team SEVENTEEN. Because it is a temporal impossibility for an August 11 request to adjudicate a clinical diagnosis that did not exist until September 10, the record establishes that the September 10 Clinical Spoliation was a coordinated action manufactured to facilitate a pre-determined denial of benefits. This mechanical link connects the Defendant's unauthorized extra-clinical contact directly to the proximate cause of the benefits denial and subsequent damages.

**60. Causation: Diagnostic Overshadowing and the Benefits Blockade:** The Defendant's unverified diagnostic entry served as the direct and proximate cause of a "Diagnostic Overshadowing" cascade. By overriding the Plaintiff's verified, service-connected TBI/PTSD baseline with an unconsented, undisclosed "Bipolar disorder" label, the Defendant successfully blockaded the Plaintiff's access to Line of Duty - Health Care (LOD-HC) benefits, which was the Plaintiff's explicitly stated "Chief Complaint" during the patient encounter **(Exhibit 5a p. 3)**.

**61. Causation: Improper Leverage of Administrative Urgency:** The LOD-HC authorization was a strict administrative prerequisite for maintaining the Plaintiff's ongoing trauma care, as his statutory 180-day post-deployment TRICARE Prime coverage was imminently expiring following his demobilization **(Exhibit 2i)**. Rather than recognizing the Plaintiff's rational, time-sensitive distress regarding the imminent loss of his life-saving healthcare coverage, the

Defendant's agent (NP Hansen) mischaracterized this valid administrative urgency as a psychiatric symptom. This action improperly leveraged the Plaintiff's plea for continuity of care to justify the fabricated Bipolar narrative **(Exhibit 5a, p. 3)**.

**62. Damages: Somatic Harm and Commercial Insolvency:** As a direct result of this clinical spoliation, the Plaintiff suffered foreseeable and catastrophic damages. The immediate cessation of necessary neurological care proximately caused severe neurocognitive deterioration and triggered a recursive somatic harm loop. Furthermore, this medical abandonment initiated a multi-year period of administrative attrition, proximately causing the commercial insolvency of Three Shades Maritime LLC and severe economic destruction, the full sum certain of which is detailed in the Prayer for Relief **(Exhibit 3b, Exhibit 3c; Exhibit 3f; Exhibit 3g)**.

**63. Coordinated Admissions of Negligence:** The Defendant's agents have issued multiple written retractions confirming these foundational breaches. On November 19, 2020, NP Hansen admitted the initial treatment plan was unsupportable, stating Depakote was "no longer indicated for what first appeared to be mania" **(Exhibit 7a, p. 6)**. This clinical retraction was later codified by the Navy on April 14, 2023, when PERS-95 formally admitted that "the initial diagnosis of bipolar disorder (disease) was incorrect" and had been "erroneously listed as a denied condition" during the 2020 blockade **(Exhibit 5b)**. Together, these retractions constitute a documented chain of admission proving the September 10, 2020, intake was a terminal deviation from the standard of care.

**64. Breach: Persistence in Known Inaccuracy and Refusal to Correct:** Despite the Plaintiff's immediate and repeated rebuttals—which pointed directly to the 15-year established clinical baseline—Defendants breached their ministerial duties by refusing to correct the "provisional" Bipolar I diagnosis. This persistence in a factually unsupportable narrative forced the Plaintiff to

secure independent, out-of-pocket medical evaluations simply to prove the facial invalidity of the Bipolar claim and restore his clinical reality **(Exhibit 3a; Exhibit 3c; Exhibit 3g)**. The Defendants' demand for "independent external supporting documentation" to verify a baseline they were already legally mandated to maintain constitutes a bad-faith administrative blockade. This refusal to acknowledge the verified record proximately caused the Plaintiff's financial exhaustion and the multi-year delay in his access to service-connected neurological care.

**65. Constructive Denial of Benefits and Clinical Tethering:** Even after the April 14, 2023, formal admission of error and subsequent award of LOD-HC benefits for PTSD **(Exhibit 5b)**, the Defendant executed a "Constructive Denial" of these benefits. The Defendant achieved this by authorizing the awarded care exclusively through the same VA clinics and providers that executed the original Clinical Spoliation. This intentional tethering of care to a compromised clinical environment—where the Plaintiff's Master Record remained poisoned by the unretracted Category I Patient Record Flag **(Exhibit 7)**—constituted a bad-faith effort to "shell game" the Plaintiff's recovery. This maneuver effectively nullified the awarded benefits and proximately contributed to the ongoing destruction of the Plaintiff's professional and medical stability.

**66. Constructive Denial: The Out-of-Pocket Burden & Initial Stall:** The Defendant further executed a "Constructive Denial" of the Plaintiff's awarded benefits by engineering an arbitrary administrative barrier regarding the reimbursement of out-of-pocket expenses. Between January 2021 and the Present, the Plaintiff has been forced to secure independent trauma care from Worthy Life Wellness and supplementary private specialists solely due to the Defendant's ongoing clinical abandonment. Following the April 2023 LOD-HC award—which was explicitly backdated to January 2020—ST-17 administrative agents (specifically LCDR Amy Leber) initiated a stalling tactic, claiming on May 25, 2023, that the Command had "not yet

encountered" processing reimbursements for costs incurred prior to LOD-HC approval **(Exhibit 5e)**.

**67. The Reimbursement Shell Game & Procedural Impossibility:** Following this initial delay, the Defendant formalized the blockade. On June 5, 2023, HM1 Daniel Carr advised the Plaintiff that the Navy would not provide direct reimbursement; instead, the private clinic would be required to retroactively "back-bill" TRICARE for the previous years of care **(Exhibit 5f)**. By shifting the fiscal liability from the Navy—the party that breached the duty—to a third-party insurer and a private civilian clinic, the Defendant intentionally created a procedural impossibility, as TRICARE maintains strict timely-filing limits. This administrative shell game proximately caused the complete failure of the reimbursement claim and unilaterally extended the Plaintiff's financial injury during a period of documented vulnerability.

**E. The Due Process Void and Adjudicative Attrition**

**68. The Professional Baseline and Vested Trajectory:** As of September 15, 2020, the Plaintiff's professional baseline was characterized by fifteen (15) years of elite service and an "Early Promote" (EP) performance trajectory. At the time of the foundational tort, the Plaintiff was actively sought for high-priority reserve activation orders, including ADSW orders for the TACMED Training Cell, mobilization requirements, and a Training Officer position at SEAL Team SEVENTEEN. The Plaintiff had just successfully completed back-to-back Leading Petty Officer leadership tours and had achieved the rank of Chief Petty Officer **(Exhibit 1a; Exhibit 3b; Exhibit 3e)**.

**69. Duty: Adjudicative Due Process and Record Accuracy:** Pursuant to the Ministerial Mandates identified in Section IV (specifically SECNAVINST 1770.5 and SECNAVINST

1850.4E), the Defendant possessed a non-discretionary, ministerial duty to assign a Physical Evaluation Board Liaison Officer (PEBLO) to ensure due process. Furthermore, the Defendant was legally mandated to procure the member's physical signature or formal "Election of Options" prior to any adverse adjudication, and to ensure that any Non-Medical Assessment (NMA) generated was mathematically accurate and consistent with the member's actual military baseline and combat qualifications **(Exhibit 1d; Exhibit 1h)**.

**70. Breach: The Contradictory Non-Medical Assessment (NMA):** On March 3, 2021, the Command generated a Non-Medical Assessment (NMA) signed by CAPT Christopher Carter that was mathematically and factually unsupportable. This document inaccurately stated: *"Due to his current medical status, lack of attempt to better himself, and inconsistent communication, member is unable to perform his primary duties in garrison/shore and field/sea duty environments."* This defamatory characterization stands in stark professional contrast to the exact same Reporting Senior's (CAPT Carter) own evaluation from just six months prior (period ending September 15, 2020), which explicitly certified the Plaintiff as a "Phenomenal Chief" and a "Deployable SEAL" following his successful reintegration from his second consecutive mobilization **(Exhibit 6, pp. 3-4, 7-9)**. This administrative pivot—suddenly labeling an elite operator as "unable to perform" while he was simultaneously actively screening for high-level government contracts previously encouraged by the Command—serves as definitive evidence of Administrative Attrition rather than objective clinical adjudication **(Exhibit 2d pp. 6-8)**.

**71. Breach: Adjudicative Attrition and Procedural Bypasses:** During this same window, the Defendant committed multiple documented ministerial breaches regarding Line of Duty - Health Care (LOD-HC) processing. Specifically, the Defendant executed a rapid, unauthorized denial of LOD-HC benefits just twenty-five (25) days after the foundational clinical tort **(Exhibit 6, p. 5)**.

To achieve this, the Defendant administratively misapplied the unverifiable "Provisional Bipolar" diagnosis to supersede the Plaintiff's 15-year combat trauma baseline. Furthermore, the Defendant bypassed the mandatory requirement for the Plaintiff's signature on the adjudicative record, completely denying the Plaintiff a PEBLO or an "Election of Options" until August 2022 **(Exhibit 6, p. 31)**. The Defendant culminated this breach by generating the aforementioned March 2021 NMA, which omitted critical, mathematically verified data, including the Plaintiff's Combat Action Ribbon (CAR) **(Exhibit 6, pp. 7-8)**.

**72. Causation: The "Shadow Board" and Medical Hold Paralysis:** These ministerial breaches acted as the administrative linchpin that directly collapsed the Plaintiff's career. By denying the LOD-HC service connection via an unauthorized "Shadow Board" procedural bypass, the Defendant effectively severed the Plaintiff's access to necessary medical treatment while simultaneously triggering an automatic administrative "Medical Hold." This immediate hold paralyzed the Plaintiff's ability to activate the ADSW and mobilization orders that had been initiated as contingency options during his de-mobilization process **(Exhibit 3b, Exhibit 3c; Exhibit 3e; Exhibit 6)**.

**73. Plaintiff's Good-Faith Mitigation and Command Obstruction:** During the multi-year Medical Retention Review (MRR) period in which the Defendant placed the Plaintiff in a non-drill, non-pay status, the Plaintiff executed continuous, good-faith efforts to mitigate his career attrition. The Plaintiff proactively sought to maintain his Reserve career trajectory by enrolling in and completing authorized, non-paid correspondence courses to accrue statutory retirement / drill points. Despite the Plaintiff's efforts to mitigate his professional damages, the Defendant (via ST-17 administrative personnel) applied continuous administrative friction, imposing arbitrary barriers to course approval and artificially delaying the processing of the Plaintiff's earned

retirement points through prolonged "request chit" referral loops and denying his entry to the courses even after his requests were approved **(Exhibit 6, p. 33)**.

**74. Damages: Economic Destruction and Clearance Jeopardy:** As a proximate result of this administrative purge, the Plaintiff suffered catastrophic injuries. These include the immediate loss of all military income streams, the severe disruption of his Specialty Overseas Security Contracting (SOSC) trajectories, and the severe exacerbation of his TBI/PTSD symptoms due to the blockade of competent care during a documented crisis.

**75. Damages: Economic Destruction and Clearance Jeopardy – cont.:** Furthermore, the facially unsupportable LOD-HC submission, processed contrary to the mandates of ministerial procedures, placed the Plaintiff's civilian security clearance in immediate jeopardy. Through Forensic Reconstruction, the Plaintiff identifies these administrative breaches as the definitive cause of his commercial insolvency and the destruction of his O-5E trajectory **(Exhibit 3b, Exhibit 3e, Exhibit 5b)**.

**76. Coordinated Admission: The Administrative Retraction:** On August 29, 2022, the Defendant executed a formal "Administrative Retread" and a written admission of the breaches cited above. CAPT Christopher Carter issued a "Letter in Support" which explicitly corrected and reversed his facially incorrect March 3, 2021, NMA. CAPT Carter wrote: *"I am writing to provide corrections and updates... Combat Action Ribbon... Do recommend for retention"* **(Exhibit 6, p. 9)**. This document confirms that the prior administrative assessment was a bad-faith deviation from the established baseline and a terminal breach of the Defendant's ministerial duty to verify the accuracy of the record prior to adverse adjudication.

**F. The Kinetic Manifestation: Administrative Attrition and the Recursive Somatic Harm Loop**

**76. Breach: The Red Flag and Procedural Bypass:** In February 2021, the Defendant's Disruptive Behavior Committee (DBC) committed a terminal ministerial breach of VHA Directive 1077 by affixing a "Category I Patient Record Flag" (PRF) to the Plaintiff's medical record. The Defendant executed this action without meeting the mandatory procedural thresholds, failing to provide the required due process, and acting without any objective documentation of a compelling safety risk **(Exhibit 1g; Exhibit 7)**.

**77. The Clinical Contradiction and Breach of Fairness:** This manufactured "disruptive" designation was directly refuted by a contemporaneous professional assessment. Just seven (7) days prior to the DBC's administrative breach, the Plaintiff's VA Primary Care Provider (Dr. Heitker) conducted an objective clinical evaluation and documented that the Plaintiff was merely "understandably upset" due to the devastating impact of the Defendant's administrative attrition on his career **(Exhibit 3d, p. 9)**. The DBC's failure to reconcile this verified clinical observation with their punitive administrative characterization constitutes a direct breach of the "Fairness" mandate in VHA Directive 1004.04 **(Exhibit 1c)**.

**78. The Institutional Care Blockade:** The "toxic" metadata status created by this unauthorized PRF functioned as a strict, non-clinical blockade to care. This flag administratively barred the Plaintiff from receiving short-term objective surgical evaluations between February and June 2021, and actively blocked his access to specialized brain injury referrals for over two years following his initial crisis **(Exhibit 3a, pp. 7-8; Exhibit 3d)**.

**79. Breach: The Circular Grievance Loop and Administrative Futility:** To compound this blockade, the Defendant engineered a bad-faith "circular grievance loop" to intentionally neutralize the Plaintiff's right to redress. The February 2021 DBC "Red Flag" correspondence explicitly directed the Plaintiff to route any complaints or appeals regarding his restricted care through the local VA Patient Advocate office. However, the record proves the Plaintiff had already engaged in extensive, documented correspondence with that exact office (specifically, Patient Advocate Christine Jost) on January 21, 2021—weeks prior to the DBC action— explicitly detailing the clinical spoliation and his active medical abandonment **(Exhibit 7b pp 9-13)**. By formally directing the Plaintiff back to the very administrative entity that had already ignored his verified medical crisis, the Defendant intentionally trapped the Plaintiff in an administrative void, rendering the mandatory grievance process entirely futile and abusing the administrative processes of the bureaucracy to enforce the blockade.

**80. Breach: Summary Medical Abandonment:** This blockade was compounded by the Defendant's severe Administrative Abandonment of the Plaintiff. Specifically, the Defendant executed a summary termination of the Plaintiff's Transition Care Management (TCM) services—a termination that was executed *while the Plaintiff was actively engaged in a telehealth session with a different provider* **(Exhibit 7a)**. Severing case management services during a documented clinical crisis represents a terminal breach of VHA Directives 1907.01 and 1110, violating the non-discretionary duty to maintain clinical stability and continuity of care for high-risk transitioning veterans **(Exhibit 1h)**.

**81. Causation: The Recursive Somatic Harm Loop:** As a direct and proximate result of the Defendant's administrative hostility—specifically the severe psychological distress induced by the receipt of the DBC "Red Flag" letter—the Plaintiff was forced into a Recursive Somatic

Harm Loop. The receipt of this correspondence triggered an acute, violent panic attack accompanied by severe gastrointestinal distress and forceful vomiting. This physiological mechanism is clinically anchored to the vestibular dysfunction, migraines, and severe PTSD manifestations previously verified by the Marcus Institute for Brain Health and independent experts **(Exhibit 3a, p. 3; Exhibit 3h; Exhibit 3g)**.

**82. Damages: Catastrophic Physical Manifestation (The Hernia):** On or about February 13, 2021, the physiological force of this administratively induced vomiting caused a catastrophic failure of the Plaintiff's abdominal wall. This physical injury is explicitly documented in the February 14, 2021, Emergency Department encounter, where the Plaintiff was formally diagnosed with a "Unilateral Inguinal Hernia" **(Exhibit 7, p. 9; Exhibit 7, p. 28)**. This traumatic physical rupture, occurring within 24 hours of the Plaintiff's receipt of the Red Flag issuance, serves as the undeniable, quantifiable physical manifestation of the Defendant's ministerial negligence.

**83. Expert Rebuttal of Diagnostic Spoliation:** The foundational "Bipolar I" diagnosis—the poisoned root used to justify this entire administrative blockade—was later formally identified as "negligent" and a "breach of duty" by medical expert Dr. Nikole Roberts, PhD **(Exhibit 3c)**. This assessment was corroborated by Dr. Perris Monrow, PsyD, who identified the Plaintiff's condition as a clear nexus of combat-related PTSD and TBI. The record demonstrates that the Defendant intentionally suppressed these clinical realities to manufacture the behavioral fiction used to justify the Plaintiff's systemic decoupling from care **(Exhibit 2b)**.

**84. Admission of Prior Negligence via Surgical Retraction:** The Defendant eventually executed a *de facto* administrative retraction and an admission of prior negligence on June 8, 2021, by finally providing the surgical repair for the left inguinal hernia **(Exhibit 7, pp 27)**. This

surgical intervention, occurring only after the Plaintiff's physical condition had significantly and unnecessarily deteriorated due to months of institutional obstruction, constitutes a mechanical admission by the Defendant that the condition was an acute medical necessity, directly contradicting their initial non-clinical blockade.

**85. Economic Destruction: The Civilian Contracting Pipeline:** The nexus of the Defendant's physical injury and clinical spoliation resulted in the direct forfeiture of high-value overseas security consulting opportunities with a Specialty Overseas Security Contracting (SOSC) agency **(Exhibit 3a, pp. 4-6)**. Prior to the Defendant's breach, the Plaintiff was scheduled for a highly lucrative contract progression, including a contract signing on February 3, 2021, in Herndon, VA, specialized training in Ashburn, VA (April 5–14), and a terminal course at Ft. Carson, CO (starting April 19) **(Exhibit 2d, pp. 6-8)**.

**86. Damages: The Tradecraft Blockade and Financial Forfeiture:** Despite the Plaintiff successfully passing the elite "hard skills" of the tradecraft (shooting, CQC, and physical fitness tests in line with his SEAL Medic/JTAC baseline), the ~February 13, 2021, physiological rupture (hernia) rendered progression impossible. The SOSC Program Manager explicitly directed the Plaintiff to return only when his abdominal and other injuries were resolved (colloquially noting when his "guts weren't dangling down around his ankles"), as the advanced tradecraft required a pain-free, medically sound baseline. The Defendant's treatment delays directly caused the forfeiture of this contract, which carried a verified trajectory of $700 to $2,000 per day on a rotating overseas schedule **(Exhibit 2d, pp. 6-8)**.

**87. But-For Causation and Total Commercial Insolvency:** But for the Defendant's coordinated failure to reconcile the Plaintiff's "Early Promote" evaluation baseline with his documented physiological fragility, the Plaintiff would have successfully executed the SOSC route and

maintained his existing National Geographic / Disney+ contracts. Instead, the Defendant's prioritization of an administrative purge over the professional clinical alerts of an Advanced Tactical Practitioner directly resulted in the total commercial insolvency of Three Shades Maritime LLC.

**G. Phase C: The Terminal Adjudicative Purge and Coordinated Ejection**

**87. Actual Notice to the Command:** On June 2, 2022, the Plaintiff provided Actual Notice to the Commanding Officer of SEAL Team SEVENTEEN regarding the terminal breach of mental health stigma protections mandated by DoDI 6490.08 **(Exhibit 1c)**. During this formal redress encounter (CO's Mast), the Plaintiff presented a forensic timeline documenting that the administrative "Red Flag" **(Exhibit 7)** and the unverified Bipolar I diagnosis **(Exhibit 3c)** were actively being utilized as non-clinical barriers to care, resulting from documented collusion between ST-17's medical department and the VA Transition Case Management team **(Exhibit 4b; Exhibit 4c; Exhibit 7)**.

**88. The Command Assurances and Ministerial Duty:** The Plaintiff explicitly warned the Command that prioritizing administrative metrics over the "Direct Access to Care without Stigma" mandate significantly increased Command liability, as the medical abandonment of high-risk Special Operators directly leads to severe adverse manifestations and harmful to the force. In response, the Command provided formal assurances that they would facilitate a Board for Correction of Naval Records (BCNR) package and remove the unverified diagnosis **(Exhibit 3b)**. This exchange established a clear ministerial duty for the Command to correct the record and restore the Plaintiff's clinical baseline.

**89. The NCIS Referral and Subversion of Investigative Integrity:** Following the disillusionment of these command assurances—where the day-to-day obstruction of care remained unchanged despite actual notice—the Plaintiff discovered ongoing tortious activity and sought redress via a non-anonymous NCIS tip. Instead of fulfilling the independent duty to investigate the reported medical-administrative misconduct, the Defendant facilitated a terminal breach of investigative integrity. NCIS referred the Plaintiff's tip back to the Command for an internal inquiry, unlawfully permitting the accused personnel to investigate themselves.

**90. The Adverse Command Investigation:** Empowered by this referral, the Command executed a "forced pivot" to a non-punitive Command Investigation (CI) led by LCDR Clapper. This investigation functioned strictly as an instrument of adverse administrative attrition. The report manufactured a narrative of "missed drills" to justify the Plaintiff's separation, intentionally omitting the Plaintiff's protected DWELL status **(Exhibit 1h)**, the mandatory COVID-19 remote drill travel restrictions and previous command agreements **(Exhibit 2a)**. By mis-utilizing the investigative process to attack the Plaintiff's service record rather than investigate the clinical spoliation, the Defendants breached the "Standards of Fairness" mandated by DoDI 1344.09 **(Exhibit 1e)**.

**91. The Master Record Blockade:** The resulting Clapper investigation report, retrieved by the Plaintiff via FOIA request and later lost in a hard drive crash, was characterized by the deliberate withholding of the underlying references and sources cited within the text—a terminal breach of the Privacy Act (5 U.S.C. § 552a). This "closed-door" process prevented the Plaintiff from contesting the manufactured narrative and created an additional front of the "Master Record Blockade." This active concealment proximately caused the catastrophic economic failure of

Three Shades Maritime LLC and ensured the continuation of the adjudicative void into the 2023 Physical Evaluation Board (PEB).

**92. The "All Due Haste" Contradiction:** Between April and May 2023, CDR Jared Henderson executed an adjudicative "pincer movement" that culminated in a terminal ministerial breach of SECNAVINST 1770.5. On April 11, 2023, Henderson signed a formal correction admitting that the October 2020 denial of the Plaintiff's LOD-HC benefits was "erroneous" and officially backdated the medical approval to January 22, 2020. However, having formally admitted the Plaintiff was legally entitled to rehabilitative care, Henderson acted only three days later (April 14, 2023) as the primary signatory for a follow-on denial that actively restricted the Plaintiff's access to rehabilitative care for TBI **(Exhibit 9a)**.

**93. The Administrative Ejector Seat:** This adjudicative pincer closed on or about May 17, 2023. Rather than permitting the mandated clinical stabilization period that he had just authorized to take effect, CDR Henderson facilitated the expedited referral of the Plaintiff directly into the Disability Evaluation System (DES) **(Exhibit 9a)**. By simultaneously serving as the adjudicator who controlled the medical path to a "fit-for-duty" status and the official pushing for an expedited Medical Evaluation Board (MEB), Henderson utilized the Legacy Disability Evaluation System (LDES) as an administrative ejector seat. This maneuver intentionally bypassed the mandatory recovery and stabilization period required by SECNAVINST 1770.5 and violated the "supported transition" mandate of VHA Directive 1010 while the Plaintiff remained in a documented clinical crisis.

**94. Structural Adjudicative Bias and Interlocking Boards:** The 2023 Physical Evaluation Board (PEB) proceedings were fundamentally compromised by Structural Adjudicative Bias and a terminal failure of independent review. The Plaintiff identifies Jeffrey Casella, S. B. Hamstra,

and J. Balduf as an interlocking administrative block that controlled the administrative "source code" of the record since the initial 2021 "Shadow Board." Forensically, Casella and Hamstra established the original "Non-LOD" narrative in March 2021; Hamstra and Balduf ratified that narrative in April 2022; and Balduf ultimately signed the terminal "Unfit" finding in 2023. This "Shadow Shift" permitted the Defendants to shield the board from transparency while ensuring the "poisoned" logic of the 2021 board dictated the 2023 outcome **(Exhibit 9b)**.

**95. Administrative Logic Filtering and the NMA Substitution:** The PEB panel acted as administrative conduits for a pre-determined Command outcome. While CAPT Carter (SEAL Det ST-17) had previously authored a corrected Non-Medical Assessment (NMA) to restore the Plaintiff's record, the terminal NMA was authored by CDR Van Deventer, who inherited and protected the administrative misconduct of his predecessor. The PEB formally admitted to applying "greater weight" to the Van Deventer NMA—a document drafted specifically to sanitize the August 2020 purge goal—while intentionally disregarding the Plaintiff's DSM-5 clinical baseline and the Carter NMA retraction.

**96. Suppression of Exculpatory Evidence:** The PEB's finding that the record "did not contain objective evidence to show the conditions were incurred as a result of combat" is a direct result of this Administrative Logic Filtering. This finding is irrefutably contradicted by the "Proxy Clinical Records" of CAPT (ret) Paul Sargent, MC, USN, which document treatment for combat-related PTSD at NSWG-1 as early as 2013. While the Board possessed the perfected package—including the Dr. Sargent letter, 2014 medication records, and eyewitness letters from Hartley, Miller, and Winkley—it willfully suppressed this evidence, choosing to give "greater weight" to the Command's poisoned NMA to justify its "Non-Combat" findings **(Exhibit 1a, pp. 4-6; Exhibit 10a)**.

**97. Coerced Adjudicative Election:** On or about December 2023, the Plaintiff's election to accept the Informal Physical Evaluation Board (IPEB) findings was induced by advisement from assigned military counsel, Samuel Strike. Counsel explicitly warned the Plaintiff that proceeding to a Formal Physical Evaluation Board (FPEB) carried a distinct risk. Specifically, if the board reached a different conclusion based on the Master Record having completely skipped TDRL and the "labyrinthine" nature of the incomplete and inaccurate adjudicative history left by the Defendant, the Plaintiff risked being separated instead of medically retired, faced a potential reduction of his existing 100% VA disability rating, or potentially having to repeat the entire medical processes through the TDRL pathway. Faced with the threat of administrative separation rather than retirement—and the associated catastrophic financial loss after 18 years of service— the Plaintiff was coerced into waiving his right to a formal hearing to mitigate these risks.

**98. Coerced Acceptance and Adjudicative Exhaustion:** On or about December 2023, the Plaintiff's decision to accept the Physical Evaluation Board (PEB) findings and his placement on the Permanent Disability Retired List (PDRL) was not a voluntary concession, but a coerced election born of severe adjudicative exhaustion. Faced with the Defendant's demonstrated pattern of disregarding objective medical evidence and eyewitness testimony, the Plaintiff recognized that further appeals would only subject him to an indefinite cycle of administrative obstruction and medical tethering. This realization—that the Defendant would continue to suppress his clinical baseline regardless of the evidence presented—served as the definitive "nail in the coffin" for his 18-year career, forcing a premature medical retirement simply to escape the Defendant's ongoing administrative hostility.

**99. Systemic Misrepresentation of Post-Service Compensation:** Furthermore, this coerced separation was induced by systemic misrepresentations regarding the Plaintiff's post-service

compensation. The Plaintiff was led to believe that adjudication within the military's Disability Evaluation System (DES)—the exact framework utilized for active-duty members—combined with his verified combat service connection, would entitle him to the equivalent of an active-duty retirement. Specifically, the Plaintiff was induced to expect the concurrent receipt of both DoD retirement pay and his 100% VA disability compensation, creating a false expectation of immediate financial stabilization upon his discharge.

**100. The CRSC Inducement and Subsequent Financial Blockade:** The Plaintiff was further advised that this specific adjudicative path would secure his eligibility for Combat-Related Special Compensation (CRSC), maximized at his existing 100% VA rating level. While aware of the extensive administrative backlog for CRSC processing, the Plaintiff relied upon the Defendant's representations of immediate, standard retirement pay (starting in March 2024) to bridge the financial gap. These systemic inducements directly secured the Plaintiff's waiver of his right to comprehensive medical deconfliction and formal hearings. The Defendant subsequently misapplied this coerced waiver to initiate the devastating post-discharge financial blockade and unverified debt collection actions documented herein.

**H. Phase D: Post-Service Financial Harm and Administrative Disruption**

**101. The Post-Service Accounting Disruption: The Unverified VA Debt:** In June 2023, the Department of Veterans Affairs (VA) notified the Plaintiff of a claimed debt in the amount of $18,492.85. The Plaintiff immediately disputed the debt, providing notice that the funds had been previously withheld from his disability compensation and pension entitlements. In response to the Plaintiff's demand for verification, the VA provided an accounting ledger that was internally inconsistent and failed to substantiate the claim **(Exhibit 3i; Exhibit 11a)**. This ongoing, post-service enforcement of an unverified and disputed debt constitutes a direct continuation of the

administrative negligence initiated in August 2020 by the St. Louis Regional Veterans Affairs network.

**102. Post-Service Baseline: PDRL and SGLI Ineligibility:** In March 2024, the Plaintiff was medically retired, placed on the Permanent Disability Retired List (PDRL), and fully transitioned to the status of a private civilian. During the preceding Medical Retention Review (MRR) period (2021–2024), the Defendant had administratively placed the Plaintiff in a non-pay, non-drill status. This status rendered the Plaintiff statutorily ineligible for active Reserve orders and the associated Servicemembers' Group Life Insurance (SGLI) premium accrual.

**103. Duty: DD Form 139 Processing and Record Provision:** Pursuant to the DoD Financial Management Regulation (DoD FMR) Vol. 7A, the Defendant's personnel—specifically the administrative elements within SEAL Team SEVENTEEN—maintained a non-discretionary, ministerial duty to accurately process pay suspensions via a completed and signed Pay Adjustment Authorization (DD Form 139). Furthermore, pursuant to basic record-keeping standards, the Defendant maintained a duty to provide the service member with copies of finalized administrative actions affecting their civilian financial standing **(Exhibit 1e)**.

**104. Breach: The Unsigned DD Form 139 and Record Withholding:** Following the Plaintiff's retirement, upon being alerted to a facially unreliable SGLI debt, the Plaintiff directly emailed ST-17 personnel (including the command-designated legal officer, Michael Blackwell). The Plaintiff diligently completed the DD Form 139 and submitted the necessary documents to PS1 Corey Delaney to initiate the DWOWS cancellation process. However, the Defendant's agents committed a fundamental ministerial breach: they forwarded the DD Form 139 for processing without the mandatory authorizing signature. Furthermore, despite the Plaintiff's explicit requests for the finalized documents for his records, the Defendant failed to provide them,

effectively preventing the Plaintiff from identifying or correcting the Defendant's clerical error **(Exhibit 12b)**.

**105. Administrative Exhaustion and Treasury Rejection:** Because the Defendant failed to properly execute the administrative recall, the erroneous debt was forwarded to the Department of the Treasury for collection. On December 4, 2024, the Plaintiff executed a "Cross-Servicing Debtor Dispute" directly with the Treasury **(Exhibit 12a, p. 2)**. The Treasury subsequently rejected the dispute—not because the debt was factually valid, but explicitly because the Defendant's submitted DD Form 139 lacked the required authorizing signature.

**106. Admission of Prior Negligence:** After nearly a year of administrative delay and internal command confusion regarding signature authority, ST-17 personnel finally signed the DD Form 139. On September 15, 2025, the Defense Finance and Accounting Service (DFAS) issued a formal letter to U.S. Representative Mike Bost, effectively admitting the prior ministerial breach. The letter confirmed the debt was successfully cancelled only *"Upon receipt of a completed Pay Adjustment Authorization (DD Form 139) issued by SEAL Team Seventeen,"* confirming that the missing signature was the sole proximate cause of the prolonged Treasury collection action **(Exhibit 12a, p. 3)**.

**107. Causation and Damages: Civilian Credit Interference:** The Defendant's post-discharge transmission of the unsigned DD Form 139 constituted an independent, civilian-status injury. This singular clerical failure proximately caused severe economic friction and targeted damage to the Plaintiff's civilian creditworthiness. Specifically, the Defendant's erroneous Treasury referral directly interfered with and stalled the Plaintiff's application for a Home Equity Line of Credit (HELOC) with Peoples National Bank in December 2024, blocking the Plaintiff's access to vital civilian capital and artificially prolonging his financial duress **(Exhibit 12b, p. 5)**.

**108. Damages: Administrative Exhaustion and Mitigation Costs:** Mitigating this ongoing, erroneous collection action necessitated hundreds of hours of uncompensated administrative labor by the Plaintiff—including the necessity of coordinating a Congressional Inquiry. This extensive mitigation effort was required to reverse an injury that would have been avoided entirely had the Defendant's agent originally executed a basic signature on the package the Plaintiff properly submitted for processing **(Exhibit 12b, p. 7)**.

**109. PDRL Baseline and Command Objective:** In February 2024, Navy Personnel Command (PERS) issued the Plaintiff's Permanent Disability Retirement List (PDRL) orders, officially directing his medical retirement **(Exhibit 13a, pp. 1-2)**. Prior to this date, SEAL Team SEVENTEEN leadership acknowledged in official correspondence to U.S. Senator Tammy Duckworth that the Command's terminal administrative objective was to navigate the Plaintiff toward this specific "SELRES retirement" outcome **(Exhibit 14a)**.

**110. Duty: PDRL Processing and Record Transmission:** Pursuant to standard Department of the Navy separation instructions and the explicit, non-discretionary mandates contained in Line 11 of the Plaintiff's PDRL Authorization Message, the Defendant's local command (ST-17) maintained a strict ministerial duty. Specifically, the Command was mandated to *"Discharge member(s) and complete applicable discharge paperwork... [and] forward discharge paperwork, DD 214, PG 13, SOS, Rank History... to DFAS requesting placement onto the PDRL."* For Reserve personnel, this explicitly includes the generation and submission of the NAVPERS 1070-615 (the Reserve DD-214 equivalent) **(Exhibit 13a, p. 2)**.

**111. Breach: The DFAS Submission Failure:** Following the Plaintiff's retirement in March 2024, the Defendant breached this duty by failing to submit a complete, certified retirement package to the Defense Finance and Accounting Service (DFAS). Over the subsequent ten (10)

months, ST-17 administrative personnel (including Michael Blackwell and PS1 Straub) engaged in a documented "circular referral" loop. Rather than consulting binding administrative reference manuals to ascertain the correct procedural requirements for a SELRES medical retirement, ST-17 personnel failed to execute the established protocols. Despite being formally notified by DFAS and the MyNavy Career Center (MNCC) that the package was incomplete, the Defendant improperly instructed the civilian Plaintiff to independently source his own command-level separation documents, effectively abandoning their ministerial obligations **(Exhibit 13a)**.

**112. Causation: The TRICARE Medical Circular Referral Loop:** Because DFAS cannot legally establish a retirement pay account without the originating command's certified documentation submitted to them from the command, ST-17's ministerial failure served as an absolute administrative blockade. This negligence directly obstructed the Plaintiff's statutorily mandated transition, causing another referral loop to ensure post-service TRICARE medical insurance enrollment and exhaustive efforts to "connect the dots" for the ST-17s admin department to submit the appropriate documentation to formally process his retirement during a period of documented clinical and career vulnerability.

**113. Damages: CRSC Delay and Economic Deprivation:** The Defendant's post-discharge administrative attrition proximately caused quantifiable economic injury. By stalling the creation of the DFAS account for nearly a year, the Defendant artificially blocked the Plaintiff from initiating his Combat-Related Special Compensation (CRSC) application. Because the CRSC program operates with a multi-year statutory backlog, ST-17's clerical failure unilaterally compounded the Plaintiff's civilian financial duress, adding twelve months of unwarranted financial deprivation to an already delayed economic recovery process.

**114. Records Spoliation and Constructive Denial:** The Defendants have maintained a post-service referral loop resulting in the continued denial of the Plaintiff's access to his own medical and administrative records. This includes a formal admission from NCIS asserting a "no records" finding, despite the Plaintiff possessing Actual Notice that such records exist and were actively utilized in the terminal PEB findings. This failure to maintain and provide accurate records constitutes a standalone violation of the Privacy Act (5 U.S.C. § 552a). It operates as a continuing administrative obstruction that severely prejudices the Plaintiff's ability to perfect his legal claims and resolve his adjudicative status **(Exhibit 15a)**.

**115. Administrative Obstruction of Appellate Remand:** The Defendant's ongoing partial production of the master adjudicative record, confirmed via April 7, 2026, correspondence, serves as prima facie evidence of the Coordinated Administrative Failure alleged herein. Despite a March 19, 2026, Office of the Judge Advocate General (OJAG) Remand **(Exhibit 15a)** ordering additional action, the Defendant (via NPC) improperly attempted to reset statutory deadlines by claiming the request was "unperfected" due to a lack of clarity.

**116. The Procedural Contradiction and Perfection of Record:** The Defendant's ongoing partial production of the master adjudicative record serves as prima facie evidence of administrative obstruction. Following a March 19, 2026, Office of the Judge Advocate General (OJAG) Remand ordering additional action, the Defendant (via NPC) improperly attempted to reset statutory deadlines by claiming on March 27, 2026, that the request was "unperfected."

**117.** This administrative claim is factually refuted by the Defendant's own prior action on March 9, 2026, wherein the Defendant assigned a tracking number and referred the exact same request to NAVSPECWARCOM—a procedural action that legally requires a perfected request under 32 C.F.R. § 701.8. Furthermore, the Plaintiff explicitly cured any alleged ambiguity through detailed

perfection requirements provided on March 29 and April 8, 2026, identifying the specific professional credentials (NPI/NEC) and mandatory instructions (DoDI 6490.05) required for production **(Exhibit 15b)**.

**118. The Empty Production and Constructive Denial:** Despite this explicit clarification, the Defendant administratively "Closed" the request on April 7, 2026, issuing a formal letter claiming a "Partial Grant/Partial Denial." However, the Defendant completely failed to produce a single page of the requested Physical Evaluation Board (PEB), Medical Evaluation Board (MEB), or Line of Duty (LOD) adjudicative records. Instead, the Defendant's encrypted digital production consisted solely of administrative correspondence.

**119.** The Defendant improperly utilized FOIA Exemptions 3 and 6 to redact the identities of the ministerial actors who bypassed the requirements of SECNAVINST 1850.4E, while entirely withholding the substantive medical-legal source documents. By withholding the entirety of the primary adjudicative files, the Defendant executed a complete constructive denial of the Plaintiff's Master Record. This total failure to provide the Plaintiff with his own complete and accurate adjudicative file constitutes a terminal breach of the duty of record integrity mandated by the Privacy Act, 5 U.S.C. § 552a(e)(5) **(Exhibit 15b)**.

**120. FTCA Jurisdictional Anchor and Quantifiable Economic Injury:** The Defendant's post-discharge administrative failures—specifically the transmission of the unsigned DD Form 139 and the failure to submit the mandatory PDRL retirement package to DFAS—constitute actionable acts of ministerial negligence under the Federal Tort Claims Act (FTCA). These omissions were not discretionary policy decisions, but fundamental clerical failures executed by federal employees acting within the scope of their employment. These specific breaches of non-discretionary duty proximately caused the Plaintiff to suffer quantifiable, sum-certain economic

damages. These damages include the protracted deprivation of statutory retirement pay, the multi-year delay of CRSC entitlements, and the targeted disruption of civilian creditworthiness, successfully bridging the Defendant's military-administrative negligence into the Plaintiff's civilian financial estate.

**121. Privacy Act Jurisdictional Anchor and Adjudicative Prejudice:** Furthermore, the Defendant's ongoing records blockade constitutes an actionable jurisdictional injury under the Privacy Act, 5 U.S.C. § 552a(g)(1)(C). The Defendant's failure to maintain and produce the Plaintiff's complete and accurate adjudicative Master Record directly resulted in, and continues to sustain, adverse determinations regarding his benefits and retirement status. The constructive denial of this primary evidence—shielded behind improper redactions and circular referral loops—has severely prejudiced the Plaintiff's constitutional right to due process, forcing him to expend hundreds of hours in uncompensated administrative mitigation simply to establish facts the Defendant is legally mandated to provide.

**122. The Somatic Nexus and Prolonged Clinical Deprivation:** The culmination of these post-discharge financial and administrative blockades actively prevented the Plaintiff from achieving the clinical stabilization mandated by his medical retirement. By severing his access to TRICARE during a critical transition period and subjecting him to continuous bureaucratic friction, the Defendant's ministerial negligence foreseeably exacerbated his documented service-connected conditions. This post-service administrative attrition directly perpetuated the recursive somatic harm loop that was initially triggered by the Defendant's clinical spoliation in August 2020.

**I. Post-Discharge Security Clearance Erasure**

**123. Baseline and Clearance Status:** Pursuant to standard Department of Defense policy (DoDM 5200.02 and SEAD 3/4 guidelines), a service member's security clearance eligibility is maintained in an active or current status for up to twenty-four (24) months following separation, preserving this vital credential for civilian transition. Upon his medical retirement in March 2024, the Plaintiff possessed this vested employability asset **(Exhibit 1i)**.

**124. Duty: Clearance Preservation:** The Defendant's personnel (specifically ST-17 Security and Administrative elements) maintained a non-discretionary, ministerial duty to accurately process the Plaintiff's separation debriefs and preserve his clearance eligibility data within the Defense Information System for Security (DISS) for the mandated post-service window.

**125. Breach: Erroneous Clearance Erasure:** Following his separation, while the Plaintiff was applying for civilian employment to mitigate the Defendant's ongoing retirement pay blockade, he discovered a "no records available" status regarding his clearance. The Defendant breached its ministerial duty by erroneously decoupling or archiving the Plaintiff's security clearance data many months prior to the standard expiration date, without providing mandatory notice or due process **(Exhibit 16a)**.

**126. Constructive Denial and Causation:** When the Plaintiff contacted the Command to rectify this premature erasure, ST-17 personnel failed to correct the system, a failure currently documented within the Plaintiff's pending Naval Special Warfare Command (WARCOM) Request for Information. Because the Defendant functionally erased the Plaintiff's clearance record, the Plaintiff was administratively blocked from passing the mandatory background thresholds required for the specialized civilian employment his career trajectory was primed for **(Exhibit 16a)**.

**127. Damages: Employment Obstruction:** This post-discharge data erasure constituted an independent, civilian-status injury. By erroneously removing the Plaintiff's clearance eligibility, the Defendant directly obstructed the Plaintiff's ability to secure immediate civilian income, artificially compounding the economic deprivation inflicted by the SGLI debt and PDRL blockades **(Exhibit 16a)**.

**J. Administrative Exhaustion (Phase E: Congressional Futility)**

**128. Mitigation and Escalation:** Having exhausted all internal command remedies, including a formal request for Commanding Officer's Mast, the Plaintiff engaged in extensive, good-faith efforts to mitigate the ongoing administrative attrition by escalating the matter to the United States Congress. The Plaintiff initiated formal Congressional Inquiries through the offices of U.S. Senator Tammy Duckworth and U.S. Representative Mike Bost to compel the Defendant to adhere to its own ministerial mandates **(Exhibit 14a)**.

**129. Admission of Systemic Irregularities:** In formal, written responses to Senator Duckworth dated December 29, 2022, and February 1, 2023, the Defendant's personnel (ST-17 Commanding Officer) explicitly admitted to the presence of *"irregularities in administrative or medical processes."* Furthermore, the Defendant's own Commander characterized the Plaintiff's forced administrative path as *"frustratingly labyrinthine"* **(Exhibit 14a, pp. 1, 3)**.

**130. Constructive Exhaustion and Administrative Futility:** Despite making high-level admissions of procedural failure to federal lawmakers, the Defendant refused to correct the underlying Master Record, finalize the DD Form 139, or release the Plaintiff's obstructed retirement and medical entitlements. This documented refusal to execute basic ministerial corrections in the face of direct Congressional oversight establishes complete administrative

futility. It demonstrates to the Court that the Defendant's internal redress mechanisms were fundamentally inoperable **(Exhibit 14a)**.

**131. Congressional Record Blockade:** This administrative obstruction extended to the suppression of primary evidence. Requests for the Plaintiff's adjudicative records initiated through U.S. Representative Mike Bost were met with severe administrative inconsistency. The Defendant (via BUMED and the VA) provided written assurances to the Congressional office that the records would be delivered to the Plaintiff; however, the subsequent productions either failed to materialize, were materially incomplete, or were heavily redacted to obscure the identities of the ministerial actors involved **(Exhibit 14a, pp. 4-6)**.

**132. Ongoing Metric Manipulation and OGC Referral:** The Defendant's suppression of evidence continues to the present day through a documented practice of internal metric manipulation. The Defendant (via the St. Louis VA) routinely closes or mischaracterizes open records requests to artificially satisfy internal agency performance metrics while the underlying requests remain unfulfilled. Furthermore, when the Plaintiff formally demanded strictly compliant "Certified Copies" of his records to satisfy the Federal Rules of Evidence for this litigation, the Defendant refused to provide them. Instead, the VA effectively treated the Plaintiff's routine records request as an adversarial proceeding, referring the matter to the Office of General Counsel (OGC) to further delay production **(Exhibit 17a)**. This ongoing administrative attrition leaves the Federal Tort Claims Act as the Plaintiff's sole remaining avenue for relief.

## VI. CAUSES OF ACTION

**COUNT I: MINISTERIAL NEGLIGENCE AND MEDICAL MALPRACTICE (The Foundational Tort & Erroneous Clinical Baseline)**

**133. Incorporation by Reference:** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**134. Duty:** At all times relevant, the United States, acting through the Department of Veterans Affairs (VA) and the Department of the Navy (DoN), owed the Plaintiff a non-discretionary, ministerial duty of care, as well as a fiduciary duty of independent clinical judgment under Missouri state law (RSMo § 538.210). This duty is explicitly codified by federal mandates requiring personnel to utilize standardized diagnostic criteria (VHA Dir. 1160.01; DSM-5 via 9 CSR 30-3.151), to obtain informed consent for diagnosis alterations (VHA Dir. 1004.01), and to maintain strict separation between clinical patient data and administrative personnel actions (38 C.F.R. § 1.512; VHA Dir. 1605.01).

**135. Breach:** The Defendant's personnel (specifically NP Kimberlee Hansen and LCDR Amy Leber) breached these non-discretionary duties. On or about August and September 2020, Defendant's agents engaged in unauthorized extra-clinical coordination to bypass mandatory confidentiality protections. Subsequently, on September 10, 2020, the Defendant executed a profound clinical deviation by entering a facially invalid, unconsented "Bipolar I" diagnosis derived from a 47-minute telephonic intake. The Defendant breached the standard of care by willfully discarding the Plaintiff's 15-year verified combat-trauma and TBI baseline without adhering to the mandatory DSM-5 diagnostic criteria.

**136. Causation:** The Defendant's breach was the direct and proximate cause of the catastrophic clinical and economic injuries that followed. The introduction of this erroneous diagnosis served

as the foundational administrative justification utilized by the Defendant to execute an Institutional Care Blockade, severing the Plaintiff from necessary neurological treatment and Line of Duty - Health Care (LOD-HC) benefits.

**137. Damages:** As a direct result, the Plaintiff suffered severe, foreseeable physical and psychological deterioration, including an acute left inguinal hernia directly attributable to the administratively induced somatic harm loop. Furthermore, this clinical abandonment neutralized the Plaintiff's professional readiness, directly causing the forfeiture of elite Specialty Overseas Security Contracting opportunities and the terminal insolvency of Three Shades Maritime LLC.

**COUNT II: DEPRIVATION OF DUE PROCESS AND ADMINISTRATIVE NEGLIGENCE (Procedural Bypasses & Adjudicative Attrition)**

**138. Incorporation by Reference:** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**139. Duty:** The Defendant (via Navy Personnel Command and SEAL Team SEVENTEEN) maintained strict, non-discretionary ministerial duties governing personnel adjudication and medical retention. Pursuant to SECNAVINST 1850.4E and SECNAVINST 1770.5, the Defendant "shall" assign a Physical Evaluation Board Liaison Officer (PEBLO) and "shall" procure the member's signature or formal election of options prior to any adverse medical adjudication. Furthermore, MILPERSMAN 1070-080 mandates the accurate maintenance and reconciliation of a member's combat service and qualification record.

**140. Breach:** Between September 2020 and March 2021, the Defendant engaged in a campaign of administrative failure by executing a series of unauthorized procedural bypasses. The Defendant processed a 25-day rapid denial of LOD-HC benefits utilizing the unverified

diagnosis from Count I, entirely bypassing the mandatory requirement for the Plaintiff's signature and failing to assign a PEBLO for nearly 24 months. Furthermore, the Defendant breached its record-keeping duty by generating a March 3, 2021, Non-Medical Assessment (NMA) that intentionally filtered out the Plaintiff's verified combat baseline (including the Combat Action Ribbon) and directly contradicted the Reporting Senior's own "Talented Chief" evaluation from just six months prior.

141. **Causation:** The Defendant's mechanical failure to adhere to these mandatory due process protocols triggered an automatic, stigmatizing "Medical Hold," paralyzing the Plaintiff's ability to activate for ADSW and reserve mobilization orders to help fill critical manning requirements and bridge the financial and medical gaps identified in the Plaintiff's case.

142. **Damages:** This administrative attrition directly caused the collapse of the Plaintiff's O-5E career trajectory, the immediate cessation of military income, and the placement of the Plaintiff's civilian security clearance in jeopardy due to the facially unsupportable adjudicative submissions.

**COUNT III: POST-DISCHARGE CLERICAL NEGLIGENCE (Erroneous Debt Processing & Treasury Referral)**

143. **Incorporation by Reference:** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

144. **Civilian Status & Jurisdictional Anchor:** The breaches alleged in this Count occurred entirely after March 2024, while the Plaintiff was medically retired, placed on the Permanent Disability Retired List (PDRL), and held the status of a private civilian. Accordingly, these

independent clerical torts are not incident to military service and fall strictly outside the purview of the Feres Doctrine.

**145. Duty:** The Defendant's personnel owed a non-discretionary ministerial duty to the civilian Plaintiff to accurately process post-service financial actions. Pursuant to DoD FMR Vol. 7A, the Defendant must complete and sign a Pay Adjustment Authorization (DD Form 139) to halt erroneous debt collections.

**146. Breach:** The Defendant breached this financial mandate through gross clerical negligence. ST-17 personnel generated an unverified SGLI debt, and when the Plaintiff contested it, the Defendants forwarded the DD Form 139 to DFAS without the mandatory authorizing signature, rendering it legally void.

**147. Causation & Damages:** The Defendant's failure to sign the DD Form 139 proximately caused an erroneous debt to be forwarded to the U.S. Treasury, stalling a vital Home Equity Line of Credit (HELOC). This clerical tort necessitated Congressional intervention and proximately caused severe, ongoing damage to the Plaintiff's civilian economic standing.

**COUNT IV: POST-DISCHARGE CLERICAL NEGLIGENCE (The PDRL Retirement Blockade)**

**148. Incorporation by Reference:** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**149. Civilian Status & Jurisdictional Anchor:** The breaches alleged in this Count occurred entirely after March 2024, while the Plaintiff was medically retired and held the status of a private civilian, placing this negligence strictly outside the purview of the Feres Doctrine.

**150. Duty:** Pursuant to Line 11 of the Plaintiff's PDRL Authorization Message, the Defendant maintained a strict mandate to forward all required discharge paperwork to the Defense Finance and Accounting Service (DFAS) to establish the Plaintiff's retirement account.

**151. Breach:** The Defendant ignored the PDRL Authorization Message by failing to submit a complete retirement package to DFAS. Instead of executing this non-discretionary clerical requirement, ST-17 personnel improperly instructed the civilian Plaintiff to source his own command-level documents over a 10-month period.

**152. Causation & Damages:** The Defendant's 343-day retirement pay delay served as an absolute administrative blockade that unilaterally obstructed the Plaintiff's Combat-Related Special Compensation (CRSC) application and severed access to TRICARE. This standalone clerical failure directly compounded the Plaintiff's civilian financial duress.

**COUNT V: POST-DISCHARGE CLERICAL NEGLIGENCE (Security Clearance Erasure)**

**153. Incorporation by Reference:** Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**154. Duty:** The Defendant owed a non-discretionary, ministerial duty to accurately process the Plaintiff's separation debriefs and preserve his clearance eligibility data within the Defense Information System for Security (DISS) for the mandated 24-month post-service retention window, pursuant to DoDM 5200.02 and SEAD 3/4 guidelines.

**155. Breach:** While the Plaintiff was a private civilian, the Defendant breached this data-retention duty by prematurely and unlawfully purging or decoupling the Plaintiff's active security

clearance data from the DISS system approximately 9 to 12 months prior to the standard expiration date, without providing mandatory notice or due process.

**156. Causation & Damages:** This post-discharge data erasure constituted an independent, civilian-status injury. By artificially removing the Plaintiff's clearance eligibility from the federal database, the Defendant directly obstructed the Plaintiff's ability to pass mandatory background thresholds required to secure specialized civilian employment (e.g., Specialty Overseas Security Contracting). This administrative deprivation compounded the economic harm inflicted in Counts III and IV, severely damaging his civilian earning capacity.

**COUNT VI: BREACH OF DUTY OF RECORD INTEGRITY (The Privacy Act & Administrative Delay)**

**157. Incorporation by Reference:** Plaintiff incorporates by reference all preceding paragraphs.

**158. Duty:** The Defendant maintains a non-discretionary ministerial duty under the Privacy Act (5 U.S.C. § 552a) and VHA Directive 1907.01 to maintain and produce accurate, complete, and certified records of the Plaintiff's clinical and administrative history.

**159. Breach:** The Defendant has breached this duty by engaging in an ongoing campaign of procedural inconsistency, intentionally closing perfected records requests and attempting to bypass an Appellate Remand from the Office of the Judge Advocate General (OJAG). By improperly utilizing FOIA Exemptions 3 and 6 to redact the identity of ministerial actors while withholding substantive medical-legal source documents, the Defendant is executing a constructive denial of the Plaintiff's Master Record.

**160. Causation & Damages:** This ongoing blockade has forced the Plaintiff to expend hundreds of hours in administrative labor to execute a forensic reconstruction of his own history. The

Defendant's refusal to produce certified records proximately interferes with the Plaintiff's ability to perfect his legal claims and correct his professional record, prolonging his financial duress and adjudicative vulnerability.

## VII. PRESERVATION OF DISCOVERY RIGHTS

**161. The Necessity of Rule 26 Discovery:** Plaintiff is currently forced to litigate this action utilizing a forensic reconstruction synthesized from fragments recovered from secondary archives. The Master Adjudicative Record—containing the unredacted source documents, routing metadata, and internal communications that will definitively substantiate these ministerial duty breaches—remains under the exclusive control of the Defendant. The Plaintiff expressly preserves the right to fully develop the evidentiary record pursuant to Rule 26 of the Federal Rules of Civil Procedure.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Brent Alan Loyd identifies the Sum Certain of **$23,723,252.19** as the minimum quantifiable damage resulting from the Defendant's Coordinated Administrative Failure. Pursuant to 28 U.S.C. § 2675(b), this escalation from the initial administrative claim is necessitated by newly discovered evidence and intervening facts (including the 2024 Non-Compensated Medical Retirement, the subsequent Treasury referral, and the clearance erasure) that were not reasonably discoverable at the time of initial filing due to the Defendant's constructive denial of the Master Record.

Plaintiff respectfully requests that this Honorable Court enter judgment against the Defendant, the United States of America, and grant the following relief:

**A. Economic Damages (Aggregate Life-Cycle Opportunity Cost): $14,200,000.00** for the permanent destruction of the Plaintiff's dual-track earning capacity. This figure represents the forensic reconstruction of:

1. The quantifiable delta between the Plaintiff's earned O-5E life-cycle pay/pension trajectory and the Non-Compensated Medical Retirement induced by the Defendant's procedural bypasses.

2. The loss of high-margin Specialty Overseas Contracting Services and film industry consulting trajectories (e.g., Disney+ / National Geographic). These commercial opportunities were proximately destroyed by the Defendant's Erroneous Clinical Baseline, which rendered the Plaintiff administratively "unfit" for the security clearances and somatic performance required for these $700–$2000+/day roles.

**B. Professional Clearance & Commercial Solvency Destruction: $3,200,000.00** for the permanent impairment of the Plaintiff's specialized marketability and the catastrophic destruction of commercial credit and Operational Business Assets. This damage is the direct result of the Defendant's post-discharge clerical negligence, specifically the erroneous VA/Treasury debt referrals and the premature erasure of the Plaintiff's Security Clearance Eligibility (SEAD 3 & 4) from the DISS database. This figure incorporates the longitudinal impact of the four-year administrative blockade that proximately caused the insolvency of Three Shades Maritime LLC.

**C. Non-Economic General Damages (Somatic & Psychological): $6,223,252.19** for the foreseeable and proximate exacerbation of Traumatic Brain Injury (TBI) and PTSD symptoms resulting from the Defendant's profound clinical deviation, and the severe physical aggravation of an untreated inguinal hernia caused by the Defendant's Institutional Care Blockade. *(Note: To*

*the extent that any portion of these specific non-economic damages are subject to Missouri Revised Statutes § 538.210, Plaintiff seeks the maximum allowable statutory limits).*

**D. Forensic Reconstruction Costs: $100,000.00** in professional opportunity cost and administrative labor necessitated by the Defendant's ongoing breach of the duty of record integrity, which forced the Plaintiff to expend thousands of hours executing a multi-year forensic reconstruction of the withheld evidence.

**E. Privacy Act Equitable Relief (Record Correction):** An equitable order pursuant to 5 U.S.C. § 552a(g)(2)(A) directing the Defendant to immediately correct, amend, and accurately restore the Plaintiff's Master Adjudicative Record to reflect the verified clinical baseline, and to expunge the erroneous administrative filings utilized to force his medical retirement.

**F. Costs and Fees:** An award of all allowable litigation costs, disbursements, and reasonable fees pursuant to 28 U.S.C. § 2412 and 5 U.S.C. § 552a(g)(4)(B), together with post-judgment interest at the maximum legal rate.

**G. Further Relief:** Such other and further relief as this Court deems just, proper, and equitable under the circumstances.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted this 9th day of April, 2026.

*/s/ Brent Alan Loyd*

**Brent Alan Loyd** SOC (SEAL) ret.

*Plaintiff, Pro Se*
12915 N. Woodlawn Ln.
Woodlawn, IL 62898

(618) 316-4445
brentloyd04@gmail.com